UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

MADELINE AGUON,                    )
                                   )
              Plaintiff,           )
                                   )
        v.                         )       No. 2:09 CV 61 DDN
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
              Defendant.           )

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Madeline Aguon for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, <u>et seq.</u>, and supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381, <u>et seq.</u> The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.) For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is remanded.

**I.  BACKGROUND**

Plaintiff Madeline Aguon was born on February 1, 1956. (Tr. 13.) She has a ninth grade education, a GED, truck driving certification, and certification as a Licensed Practical Nurse (LPN). (Tr. 32-33.) She is married and lives with her husband. (Tr. 31.) She last worked for a week doing surveillance for the Catfish Bend Casino in Fort Madison, Iowa. (Tr. 33-34.) Before that, she worked at Cigarette Outlet, but for only five hours. (Tr. 34.) She previously worked as a home healthcare LPN, a cashier for a gas station, a photographer at several different Wal-Marts, and as a card dealer and in surveillance at several casinos. (Tr. 34-36.) She is a compulsive gambler and regularly plays the slot machines for up to eight or ten hours at a time. (Tr. 43-44, 49.)

On December 5, 2005, Aguon applied for disability insurance benefits and supplemental security income, alleging that she became disabled on

April 19, 2004 on account of depression, anxiety, and back problems. (Tr. 129, 137, 169.) She received a notice of disapproved claims on February 27, 2006. (Tr. 79.) She filed a written request for reconsideration on May 25, 2006, and her application was denied again on October 10, 2006. (Tr. 88, 90.) On November 2, 2006, she filed a written request for a hearing before an ALJ. (Tr. 95.) After a hearing on January 15, 2008, the ALJ denied benefits on February 27, 2008. (Tr. 8-21.) On October 5, 2009, the Appeals Council denied her request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. ADMINISTRATIVE RECORD

On April 19, 2004, Aguon injured her back, neck, and hip when, while working as a LPN, she lifted a 62-pound patient from a couch and lowered her into a bathtub. (Tr. 330, 332.) The next day, she also fell, which further irritated her lower back and neck. (Id.) On April 21, 2004, Brian S. Fritz, DC, diagnosed sacroiliac subluxation, low back pain, and cervical subluxation. (Tr. 330.) Dr. Fritz treated her neck and back with spinal manipulation and electrical muscle stimulation, recommended using ice, and scheduled additional appointments. (Id.) Aguon returned on April 23, 2004, and on April 27, 2004, stating that her low back pain was improving, but that her neck and mid back were still tight. (Tr. 331.) Dr. Fritz treated the pain with spinal manipulation, electrical muscle stimulation, and a hot pack. (Id.) Aguon did not show for her appointments on April 26, 2004, or April 28, 2004. (Id.)

In May 17, 2004, Aguon was seen by Charles Mooney, M.D., of the McFarland Clinic, for complaints of neck and right shoulder pain and symptoms of depression, anxiety, and nausea. (Tr. 268.) Dr. Mooney's examination revealed that Aguon had spasms, a reduced range of motion in her cervical spine, tenderness in her levator, and tightness in her back muscles. (Id.) Aguon's lower back pain was markedly improved, and she had no reduced range of motion in her shoulders, no sensory loss, normal grip strengths, normal flexion/extension of her wrist, and no tenderness in her lumbar or thoracic spine. (Id.) X-rays revealed mild degenerative changes of the cervical spine. (Tr. 268.) Dr. Mooney

diagnosed cervical strain and underlying degenerative disc and degenerative facet disease, and prescribed Prednisone, Skelaxin, Vicodin, and physical therapy.[1]  (Id.)  The next day, Aguon reported nausea and stomach cramps from taking the Prednisone.  (Tr. 267.)  Dr. Mooney recommended she take the Prednisone on a full stomach and to take Mylanta.  (Id.)

On July 9, 2004, Aguon went to the Fort Madison Community Hospital for treatment for a migraine headache.  (Tr. 270-74.)  She felt nauseous, dizzy, her legs were "wobbly," and she had difficulty in focusing her vision.  (Tr. 273.)  She was given Toradol and Phenergan for the pain.[2] (Tr. 270.)

On July 13, 2004, Aguon visited Theron Jameson, DO, for mid-back pain and tingling down her right arm to her elbow and/or her index and middle fingers.  (Tr. 316.)  Aguon also stated that she had blood in her stools, a change in bowel habits, chest pain, depression, dizziness, fainting spells, headaches, indigestion, leg pain, and nocturia.  (Id.) Dr. Jameson's examination revealed palpatory pain in Aguon's lumbar spine, but no pain in her hip.  (Id.)  Dr. Jameson noted a positive Spurling's sign with pain down the posterior aspect of her right arm, but no weakness in her upper extremities.  (Id.)  X-rays revealed degenerative changes.  (Id.)  Dr. Jameson scheduled Aguon for a magnetic resonance imaging (MRI) scan of her cervical and lumbar spine.  (Id.)

---

[1]Prednisone is a corticosteroid hormone that decreases the patient's immune system's response to various diseases to reduce symptoms such as swelling and allergic-type reactions.  It is used to treat conditions such as arthritis, blood disorders, breathing problems, certain cancers, eye problems, immune system diseases, and skin diseases.   Skelaxin relaxes muscles, and is used with rest and physical therapy to reduce muscle pain and spasms associated with muscle strains and sprains. Vicodin is used to relieve moderate to severe pain.  It contains a narcotic pain reliever (hydrocodone) and a non-narcotic pain reliever (acetaminophen). http://www.webmd.com/drugs/ (last visited February 17, 2011).

[2]Toraldol is used for the short-term treatment of moderate to severe pain in adults.  Phenergan is used to prevent and treat nausea and vomiting related to certain conditions.  http://www.webmd.com/drugs/ (last visited February 17, 2011).

On August 6, 2004, Dr. Jameson noted that the MRI revealed evidence of a herniated disc / disc bulge at C6/C7 that was causing impingement on the right. (Tr. 300-01, 315.) Dr. Jameson also noted signs of cervical radiculopathy. (Tr. 315.) Dr. Jameson recommended epidural steroid injections and physical therapy, and prescribed Vicodin. (Tr. 313-315.)

From August 19, 2004, through October 5, 2004, Aguon had 14 physical therapy sessions. (Tr. 281-297.) During this time, she received epidural steroid injections, which gave her significant relief from the pain. (Tr. 302-11, 314.) At her last physical therapy appointment, she said she was 75 percent better with the therapy and injections. (Tr. 295.) She last refilled her prescription medications on February 4, 2005. (Tr. 313.)

On December 13, 2005, J. Renteria, Jr., interviewed Aguon and completed a Disability Report — Field Office — Form SSA-3367. (Tr. 164-67.) Renteria noted that Aguon had no difficulty hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hand(s), or writing. (Tr. 166.)

On December 22, 2005, Norma Davis, Aguon's sister, completed a Function Report — Adult — Third Party. (Tr. 182-89.) Davis stated that on a daily basis, Aguon made coffee, watched television, made her own meals, and sometimes shopped for groceries. (Tr. 182.) Davis also stated that Aguon had trouble raising her arms up, which impairs her ability to dress herself and care for her hair, and had trouble bathing and using the toilet "when her back acts up." (Tr. 183.) According to Davis, Aguon was able to do light house cleaning for 2 hours at a time; laundry for 2 hours at a time; and drive to the grocery store and shop twice each week for 1 hour at a time. (Tr. 184-85.) Davis reported that Aguon was able to pay bills, count change, handle a savings account, and use a checkbook/money orders. (Tr. 185.) Davis also stated that Aguon's injuries affected her ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, and complete tasks, but not her ability to sit, talk, hear, see, concentrate, understand, use her hands, follow instructions, get along with others, or her memory. (Tr. 187.)

On December 25, 2004, Aguon went to the Fort Madison Community Hospital for treatment for left leg pain. (Tr. 275-80.) Robert Goodwill, MD, opined that Aguon's pain stemmed from her sciatica. (Tr. 276.) She was given Nubain[3] and Phenergan for the pain. (Tr. 277.)

On January 3, 2006, Richard Martin, Ph.D., of Psychological Consulting and Assessment, completed a disability evaluation report. (Tr. 317-320.) Aguon reported a history of depression and anxiety dating back to the 1990's. (Tr. 317.) She also stated that she was hospitalized in 2001 at the Keokuk Hospital for suicide ideation, and was hospitalized in 2003 at Mercy Hospital in Cedar Rapids following a suicide attempt. (Id.) She reported emotional and physical abuse as a child, and sexual, mental, and physical abuse as an adult, dating back to 1997, when she became a compulsive gambler and homeless. (Id.)

Also according to Dr. Martin's report, Aguon showed a normal level of consciousness and intellectual functioning, and good attention and concentration during the interview. (Tr. 318.) She was able to complete a three-step task without error and perform simple arithmetic. (Id.) Her motor activity was normal and without pain. (Id.) Her immediate memory abilities, abstract reasoning, and language abilities were intact. (Tr. 318-19.) She was able to comply with simple commands and follow a three-step command without error. (Tr. 319.) Her expressive language, speech, reading, naming, and repetition abilities were good; her writing and spelling abilities were fair; her performance on an informal task of copying complex figures was good; and her abstract reasoning abilities were intact. (Id.) She appeared mildly depressed and anxious, with a somewhat blunted affect. (Id.) She became teary at the end of the interview, when discussing her gambling problems. (Id.) She reported poor sleep, poor appetite, increased irritability, low energy, "worries," panic while in closed areas or when people were too close, and discomfort in social settings. (Id.) She denied suicidal or homicidal ideation. (Id.) Dr. Martin noted no evidence of formal thought disorder, and determined that Aguon could perform simple work and understand simple

_____

[3]A Nubain injection is administered for a variety of reasons, including treating pain. http://www.webmd.com/drugs/ (last visited February 17, 2011).

instructions and procedures. (Tr. 319-320.) Dr. Martin opined that given Aguon's history of substance abuse and gambling addiction, she could have difficulty interacting with supervisors, co-workers, and the public. (Tr. 320.) Dr. Martin also diagnosed Aguon with a generalized anxiety disorder with some notable somatoform features,[4] although his primary diagnosis was pathological gambling, given its impact on all facets of her life. (Id.) Dr. Martin assigned Aguon a GAF score of 55 for that year,[5] and a GAF score of 67 for the previous year.[6] (Id.)

On January 12, 2006, Nidal Alkurdy, M.D., of Burlington Neurology and Sleep Clinic, performed a consultative physical examination of Aguon. (Tr. 321-325.) Aguon complained of frequent shoulder and low back pain from a car accident. (Tr. 321.) She also reported frequent headaches, sometimes associated with visual disturbances, photophobia, and nausea. (Id.) Dr. Alkurdy noted that Aguon smoked a pack of cigarettes daily. (Tr. 322.) Aguon complained of depression and anxiety, but Dr. Alkurdy's examination revealed that Aguon's mental status was normal. (Id.) Aguon's strength in her upper and lower extremities, movement, gait, were

---

[4]A somatization disorder is a mental disorder characterized by presentation of a complicated medical history and of physical symptoms referring to a variety of organ systems, but without a detectible or known organic basis. Stedman's Medical Dictionary 571 (28th ed. 2006).

[5]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.
On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[6]On the GAF scale, a score from 61 to 70 represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy), but the individual generally functions well and has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

normal, as was the range of motion in her neck, back, and shoulders. (Id.) Dr. Alkurdy opined that Aguon could alternate sitting, standing, and moving around during an 8-hour work shift. (Tr. 323.) Dr. Alkurdy also stated that Aguon would have no significant problem hearing, speaking, or traveling, although she would have difficulty frequently lifting more than 25 pounds, assuming she had a back or neck pathology. (Id.) Dr. Alkurdy noted that Aguon had no specific work environment hazards. (Id.)

On January 27, 2006, Aguon completed a Personal Pain/Fatigue Questionnaire. (Tr. 177-81.) She reported suffering from frequent migraines, lower back pain, moderate neck pain lasting most of the day, constant pain in the middle of her shoulder blades and down her right arm, and "crazy legs," and that her pain was made worse by standing or bending. (Id.) She stated that she can only walk for 5 minutes at a time; perform household chores for 10-15 minutes at a time; and bathe once each week because she has muscle spasms in her neck when she washes her hair. (Tr. 178.) She does not sleep well, and the migraines and pain medications upset her stomach. (Tr. 179.) Her constant pain affects her concentration and causes anxiety. (Id.)

That same day, Aguon also completed a Function Report — Adult. (Tr. 198-205.) She stated that her back pain, migraines, restless legs, pain in her sciatica, and muscle spasms in her back keep her awake at night. (Tr. 199.) Aguon also stated that she had trouble dressing because of difficulty reaching over her head and putting on pants; difficulty bathing because she was afraid of falling and because washing her hair caused muscle spasms; difficulty caring for her hair because it was hard for her to reach and she had muscle spasms when doing so; and difficulty using the toilet because she had difficulty wiping after a bowel movement because of her lower back pain. (Id.) She was able to cook, clean dishes, sweep, mop, vacuum, mow, and perform small house hold repairs with help from a friend. (Tr. 200.) She was also able to drive, and regularly drove to purchase groceries and medicine. (Tr. 201.) At that time, she regularly watched television, played solitaire on the computer, and talked with her sister and friend. (Tr. 202.) She did not like social activities because other people stand close to her and she had

claustrophobia. (Tr. 203.) She had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, seeing, completing tasks, concentrating, understanding, following instructions, getting along with others, and with her memory, although she had no difficulty talking, hearing, or using her hands. (Id.) She attributed these difficulties to her back pain and migraine headaches. (Id.) She stated that she could only walk for a block, or for about 5 minutes, before she needed a 20 minute break. (Id.) She also stated that she could pay attention for 15 minutes; could follow written and verbal instructions fairly well; and generally associated well with authority figures. (Tr. 203-04.) She did not handle stress well, nor did she handle changes in routine well, and she feared for her safety after her mother asked her sister and brother-in-law to "knock [her] off." (Tr. 204.) She felt uncomfortable when she met with Dr. Dhuna[7] because he backed her into a corner and pushed her. (Tr. 205.) She also noted that she was legally blind in one eye, and saw flashing lights in both eyes for up to an hour at a time when she has a migraine. (Id.) When her legs bothered her at night, she felt like she has to use the bathroom every 5 minutes for up to 4 hours. (Id.)

On February 16, 2006, Debra Kuper completed Request for Medical Advice forms, in which she assessed Aguon with a GAF score of 67, and noted that Aguon appeared capable of performing unskilled, sedentary work. (Tr. 334-35.)

On February 20, 2006, Herbert Notch, Ph.D., filled out a Psychiatric Review Technique form. (Tr. 336-49.) Dr. Notch stated that Aguon had generalized persistent anxiety accompanied by apprehensive expectation, and recurrent obsessions or compulsions which were a source of marked distress. (Tr. 341.) Dr. Notch found that Aguon had mild restrictions of her daily living activities, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 346.) Dr. Notch noted Aguon's anxious mood and variable

---

[7]The administrative record does not contain any records from Dr. Dhuna.

affect, and that Aguon was panicked at times, but that her insight was good, her judgment was fair, and she could cook, clean, drive, shop, and perform other simple routine activities, but would need help handling her money because of her gambling addiction. (Tr. 348.) Dr. Notch also found Aguon's credibility eroded due to her gambling problems. (Id.)

That same day, Dr. Notch also completed a Mental Residual Functional Capacity Assessment. (Tr. 350-53.) Dr. Notch stated that Aguon was not significantly limited in her ability to remember locations and work-like procedures, nor in her ability to understand, remember, and carry out very short and simple instructions, but was moderately limited in her ability to understand, remember, and carry out detailed instructions. (Tr. 350.) Dr. Notch also found that Aguon was moderately limited in her ability to maintain attention and concentration for extended periods, but not significantly limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, or make simple work-related decisions. (Id.) Dr. Notch further found that Aguon was moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, and moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 350-51.) Dr. Notch noted no limitations in Aguon's abilities to interact appropriately with the general public, ask simple questions or require assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation. (Tr. 351.) Dr. Notch found moderate limitations in her ability to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (Id.)

On February 27, 2006, Laura Griffith, D.O., completed a Physical Residual Functional Capacity Assessment form. (Tr. 354-61.) Dr.

Griffith stated that Aguon could occasionally lift and/or carry 20 points; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit with normal breaks for a total of less than about 6 hours in an 8-hour workday; and push and/or pull for an otherwise unlimited amount of time. (Tr. 355.) Dr. Griffith explained her findings, noting that "[Aguon] has DDD[8] of her cervical and lumbar spine. She has normal muscle strength and reflexes. She cleans her home, mows and shops." (Id.) Dr. Griffith noted frequent limitations in Aguon's ability to climb a ramp or stairs, stoop, kneel, crouch, and crawl, but no limitation in climbing a ladder, rope, or scaffolds. (Tr. 356.) Dr. Griffith also found no manipulative, visual, communicative, or environmental limitations. (Tr. 357-58.)

On April 27, 2006, Karen Anderson, M.D., evaluated Aguon for irregular periods and restless leg syndrome. (Tr. 333.) Aguon reported a history of depression. (Id.) Dr. Anderson diagnosed dysfunctional uterine bleeding, depression, and restless leg syndrome. (Id.) Dr. Anderson prescribed Paxil and gave her samples of Requip[9] for her restless leg syndrome.[10] (Id.) On November 1, 2006, Dr. Anderson saw Aguon again, diagnosed her with depression and restless leg syndrom, and authorized refills of her Paxil and Requip prescriptions. (Tr. 405.)

On May 25, 2006, Rita Heyborne completed a Disability Report — Appeal form. (Tr. 217-24.) According to the report, Aguon's back pain had become more intense and nearly constant. (Tr. 217.) She also had severe cramping and heavy menstrual bleeding. (Tr. 218.) She could only bathe once a week because her lower back hurt when she got in and out of

---

[8]Degenerative disc disease.

[9]Although the records state that Aguon was given samples of "Equip," based on subsequent records, this appears to be a typographical error, and that the actual medication given was "Requip."

[10]Paxil is a selective serotonin reuptake inhibitor used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, post-traumatic stress disorder, and a severe form of premenstrual syndrome. Requip is used to treat extreme discomfort in the patient's calves when sitting or lying down. http://www.webmd.com/drugs/ (last visited February 17, 2011).

the bathtub. (Tr. 221.) She also had pain in her lower back when attempting to bend after having a bowel movement; had to rest for 10-15 minutes after 10-15 minutes of physical activity; and had to lay down 4-5 times each day for an hour at a time to rest. (Tr. 223.) Cleaning dishes caused her shoulder and lower back pain, and so she could only clean them for 5-10 minutes before needing a 10-15 minute break. (Id.) She also had migraines 1-2 times a week, during which time she could not see because of flashing lights. (Tr. 224.) Her migraines lasted from 3-4 hours to 2-3 days. (Id.) She needed help from a friend to mow her yard, perform repairs around her house and in her car, and to carry groceries. (Tr. 223-24.) A Disability Report — Appeal — Form SSA-3441 reflected much of this information, along with Aguon's reports of depression and anxiety. (Tr. 228-33.)

On August 3, 2006, John May, M.D., completed a Physical Residual Functional Capacity Assessment as a reconsideration review of Dr. Griffith's February 27, 2006 findings. (Tr. 372-79.) Despite Aguon's complaints that her back pain was more intense than before and was nearly constant, Dr. May found the same limitations as Dr. Griffith did in her assessment. (Id.)

On October 10, 2006, Sandra Davis, Ph.D., completed a Mental Residual Functional Capacity Assessment form. (Tr. 380-83.) Dr. Davis found that Aguon was not significantly limited in her ability to remember locations and work-like places; understand, remember, and carry out very short, simple, and detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions. (Tr. 380.) Dr. Davis found Aguon moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, and in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 381.) Dr. Davis found no limitations in Aguon's ability to ask simple questions or request assistance; maintain socially appropriate behavior and to adhere

to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 381.) Dr. Davis also found that Aguon was moderately limited in her ability to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (<u>Id.</u>)

That same day, Dr. Davis completed a Psychiatric Review Technique form. (Tr. 384-97.) Dr. Davis determined that Aguon suffered from unspecified depression and generalized persistent anxiety accompanied by autonomic hyperactivity, apprehensive expectation, and recurrent obsessions or compulsions which were a source of marked distress. (Tr. 387, 389.) Dr. Davis opined that Aguon had moderate difficulties in maintaining social functioning; mild restrictions on her activities of daily living; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 394.)

On November 1, 2006, Katherine Cohen, D.O., evaluated Aguon. (Tr. 402-04.) Dr. Cohen noted Aguon's history of depression, alcohol, and illegal drug use, as well as her ongoing gambling problem. (Tr. 403.) Dr. Cohen also noted that Aguon is easily angered and was severely depressed, although she was not suicidal. (<u>Id.</u>) Dr. Cohen described Aguon as a neatly dressed, very pleasant woman, who was very cooperative. (Tr. 404.) Dr. Cohen's mental status examination stated that Aguon's thought and speech were logical and goal oriented; her mood was severely depressed; her affect was blunted; she had no auditory hallucinations, but did have paranoia; her senses were clear with unimpaired memory and full orientation; her insight was good; and her judgment and impulse control were fair. (<u>Id.</u>) Dr. Cohen diagnosed Aguon with recurrent major depression with psychotic symptoms, pathological gambling, a history of methamphetamine and cocaine dependence, and a history of alcohol abuse. (<u>Id.</u>) Dr. Cohen also noted that Aguon had restless legs and minimal stress from gambling and financial issues. (<u>Id.</u>) Dr. Cohen assigned

Aguon a GAF score of 50.[11]  (Id.)  Dr. Cohen increased Aguon's Paxil dosage, recommended individual therapy, and told her to return in a month. (Tr. 404.)

On February 28, 2007, Aguon saw Dr. Cohen again.  (Tr. 406.)  Dr. Cohen reaffirmed her earlier diagnoses.  (Id.)  Dr. Cohen noted that Aguon was back late, severely depressed but not suicidal, and had not yet pursued individual therapy as earlier instructed.  (Id.)  Dr. Cohen also noted that Aguon had no energy, was losing weight, her affect was blunted, she had sold her house, she hated being with people, and she had gotten a job working at a gambling boat but had lasted only one week. (Id.)  Dr. Cohen decreased Aguon's Paxil and Lexapro dosages, continued prescribing Requip, and instructed her to pursue individual therapy and return in one month.  (Tr. 406.)

On June 21, 2007, Aguon was taken to the Fort Madison Community Hospital Emergency Room for depression after she attempted suicide.  (Tr. 417).  She ingested 12 Clonazepam pills after fighting with her brother-in-law and began to think that people did not want her around anymore.[12] (Id.)  She was very drowsy, but had no other complaints.  (Id.)  She stated that she still smoked and used alcohol occasionally.  (Id.)

The next day, Aguon was involuntarily committed to the psychiatric unit at Mercy Medical Center, based on her suicide attempt and refusal to stay.  (Tr. 408-09, 422.)  By noon that day, she was alert and oriented, and a physical examination revealed that she was stable.  (Tr. 422.)  She had no tenderness in her back or head, and normal range of motion of her back.  (Tr. 431.)  She reported that she suffered from chronic back pain and restless leg syndrome.  (Tr. 437.)

_____

[11]On the GAF scale, a score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[12]Clonazepam is used to treat seizure disorders and panic attacks. It acts on the brain and nerves to produce a calming effect. http://www.webmd.com/drugs/ (last visited February 17, 2011).

On June 23, 2007, Aguon stated that she was dealing with stress from her finances, brother-in-law, and daughter. (Tr. 425.) She reported that she had a history of depression and restless leg syndrome, and that depression ran in her mother's side of the family, with all of her uncles and one of her brothers having committed suicide. (Id.) She also mentioned a history of back problems and possible menopausal problems, but that she had been in otherwise fairly good health. (Id.) She stated that her sleep and appetitive had been fairly good. (Id.) She also stated that although she had suicidal thoughts before the drug overdose, she did not want to kill herself. (Id.) Although she was reluctant to join other patients at meals, she was observed conversing easily with peers. (Tr. 442.) A nursing progress note stated that she was visible, social, and pleasant, and that she stated that Requip helped her restless leg syndrome very well. (Tr. 444.)

On June 24, 2007, Aguon was alert and oriented; her affect was neutral; her thoughts were focused; and she was pleasant. (Tr. 445.) She had no thoughts of self-harm, and was given Ibuprofen for back pain. (Id.) She reported her back pain as a 3-4/10. (Tr. 446.) Later that day, she rated her back pain as 0/10. (Tr. 447.) She was seen putting together a puzzle with her peers. (Id.) She said that she was "happy and ready to go home" and "start a new life." (Id.)

On June 25, 2007, she requested Ibuprofen for generalized aches, and Requip for her restless leg syndrome. (Tr. 449.) She reported pain in her left leg as a 7-8/10. (Id.) That afternoon, she was prescribed Paxil, told to follow-up with a psychiatrist and counselor, and discharged. (Tr. 422, 451.)

On July 20, 2007, Aguon was admitted at Hannibal Regional Hospital for treatment following an alleged sexual assault. (Tr. 506-25.) Examinations revealed no respiratory or circulatory problems. (Tr. 514-15.) She stated that she was in no pain, and was released the next day. (Tr. 519.)

On August 1, 2007, Aguon visited Jana Paddock, MRC, for individual counseling therapy services. (Tr. 480.) Ms. Paddock noted that Aguon had pain issues, depression, was not working, and was living at a shelter. (Id.) Ms. Paddock also noted that Aguon had a "range of

affect" and appeared to have difficulty concentrating. (Id.) Ms. Paddock encouraged and assisted Aguon in forming positive self-statements, relaxation and self-hypnosis statements, boundaries, and focusing on finite stimuli to decrease anxiety. (Id.) Ms. Paddock also referred Aguon to a certified psychiatric rehabilitation practitioner. (Id.)

On August 27, 2007, Aguon was admitted at the Hannibal Regional Hospital for chest pain. (Tr. 481-505.) Upon arrival, she rated her pain a 10/10. (Tr. 483.) She also stated that she smoked one pack of cigarettes per day, and had been smoking for 40 years. (Tr. 495.) She had normal movement and strength in her arms and legs. (Tr. 496.) Her chest pain was resolved with treatment and she was discharged that day with a pain score of 0/10. (Tr. 502.)

**Testimony at the hearing**

On January 15, 2008, Aguon testified before the ALJ. (Tr. 27-78.) She was 51 years old at the time of the hearing, and lives with her husband, who she married on August 10, 2007. (Tr. 31.) She completed the ninth grade, got her GED, completed truck driving school, and began nursing school at community colleges. (Tr. 32.) Although she did not complete nursing school, because she completed enough of the program, she was able to take the LPN boards, which she passed in 1992. (Tr. 33.) She last worked for a week in surveillance at the Catfish Bend Casino in Fort Madison, Iowa, but quit because she could not sit next to another person for eight hours. (Tr. 33, 59.) Before that, she worked (1) for five hours at the Cigarette Outlet, because she was required to stand while she worked; (2) as a home healthcare LPN for a home healthcare service, CRIV; (3) at Orrick Brothers Incorporated; (4) performing home healthcare for Sue Ann Lawson; (5) performing home healthcare for Mobile Nursing Services; (6) for J.D. Carpenter Companies; (7) as a cashier for a gas station; (8) taking pictures and setting up photography studios at different Wal-Marts; and (9) as a dealer for Lady Luck Casino and the Mississippi Bell. (Tr. 34-36, 58.)

She further testified that she became disabled on April 19, 2004. (Tr. 36.) She was working for CRIV Company providing in-home total patient healthcare and injured her back lifting and carrying a patient.

(Id.)  She sought treatment for her back from a chiropractor, who gave her an adjustment and used electrodes, but the treatment was ineffective. (Tr. 36-37.)  She visited another doctor, who ordered x-rays. (Tr. 37.) After she moved, she found a new doctor, who ordered an MRI, which revealed that she had a bulging disc, and other back problems.  (Id.) The new doctor gave  her three cortisone injections and prescribed her physical therapy, pain pills, and Flexeril.  (Id.)  She could not remember that doctor's name, but her representative stated that it was Dr. Jameson. (Id.)  The cortisone injections greatly helped her pain, but they wore off after four or five months.  (Tr. 38.)  The pain pills and Flexeril were ineffective.  (Id.)  She stopped getting cortisone injections because she did not have enough money to afford them, and had not had medical coverage since she stopped working.  (Id.) She applied for "Iowa Care," but did not apply for Medicaid because social services told her she was ineligible until she began receiving disability benefits. (Tr. 38-39.)

She used $7,000 of her workers' compensation award to buy a small house, and the county paid for her utilities.  (Tr. 39.)  At this point in the hearing, Aguon asked for a break, which the ALJ granted.[13]  (Id.)

After she was injured, but before she bought her house, Aguon stayed with her mother and her sister.  (Tr. 40.)  She received a workers' compensation settlement of $32,500 in December, 2004, and purchased a home in February, 2005. (Id.)  She also used the settlement money to repair her house and to pay for a motel room for two months until the repairs were complete. (Tr. 41.)

Aguon did not see another doctor after December, 2004 until she saw Dr. Kathy Anderson in January, 2006.  (Tr. 41.)  She also saw Dr. Anderson in July and November, 2006.  (Id.)  Dr. Anderson prescribed her Paxil and Requip during that time, although Aguon was unsure of the dosages. (Tr. 41-42.)

In July, 2007, Aguon moved to Monroe City when her then-friend, now-husband, asked her to move in with him. (Tr. 42, 44-47.)  They met while

---

[13]In his opinion, the ALJ explained that Aguon "had a bad crying spell."  (Tr. 13.)

they were gambling in a Missouri casino, after she left work when she lived in Iowa. (Tr. 42-43.) She was at the casino in Missouri because she had been banned from the casino in Iowa due to her compulsive gambling addiction. (Tr. 43.) In 1997, she told the Iowa casino of her addiction, which she learned of herself at approximately the same time. (Id.) Thereafter, she continued to gamble in Las Vegas and other casinos where she was not banned. (Tr. 44.)

Before moving to Monroe City, she first lived with her mother in Burlington for a few months. (Tr. 44-47.) After that, she moved in with her sister for a few months, and then moved into a motel for a few months while waiting to move into the house she purchased with her workers' compensation money in Marshalltown. (Id.) After she sold her house, she moved in with her sister and brother-in-law in Fort Madison for six months. (Id.) She paid her sister and brother-in-law rent using money from the sale of her home. (Tr. 47.) She moved to Monroe City in July, 2007. (Id.) She still gambled when her husband took her to the casino, and was still gambling at the time of the hearing. (Id.) She gambled some of the money from the sale of her house, but used the remainder to repair an old car and pay rent. (Id.)

When she lived in her house, her husband, Jess, visited her each weekend, or she would go visit him. (Tr. 48.) Although she was able take care of her personal needs, including dressing herself, feeding herself, bathing herself, washing and combing her hair, and tying her shoes, these tasks were getting more difficult. (Id.) She was able to do grocery shopping and similar tasks, although Jess helped her with that, yard work, and other things. (Id.)

When Aguon gambles, she plays the slot machines for up to eight or ten hours at a time. (Tr. 48-49.) The most recent time she saw a doctor was in August, when she saw Dr. Yeager[14] for pneumonia. (Tr. 49.) She and her husband do not have medical insurance coverage. (Id.) She last gambled for about eight hours the weekend before the hearing at a casino in LaGrange. (Tr. 49-50.) At the time of the hearing, she was taking

---

[14]The administrative record does not contain any records from Dr. Yeager.

Paxil, Requip, and occasionally Flexeril, despite its ineffectiveness. (Tr. 50.) She did not know which doctor prescribed the medications. (Id.)

Aguon went to "Mark Twain" for counseling after she was sexually assaulted by Jess after they moved in together. (Tr. 51.) After the sexual assault, she left to live in a safe house in Hannibal. (Id.) When she left the safe house, she got back in touch with Jess. (Id.) Jess apologized and told her that he wanted her to come back and live with him. (Id.) Jess also told her that they could get married so that she would feel more secure. (Id.) Aguon married Jess and moved back in with him. (Id.) Since then, Aguon stays home because she does not have access to any money, and Jess continues to be abusive. (Tr. 52.) Aguon usually stays in her room with the door shut, although she and Jess still go gambling together. (Id.)

When she was in Iowa, Aguon went to gambler's anonymous meetings and a four-month alcohol abuse treatment program at the Burlington Hospital. (Id.) She occasionally drinks, and at the time of the hearing she had a drink as recently as the prior weekend. (Id.) In addition, in 1979, she used crystal meth, but she quit in 1982. (Tr. 53.) She also had a history of cocaine use, but has not done it since 2001. (Tr. 53-54.) She has not abused marijuana or prescription medications. (Tr. 54.)

Aguon is unable to work because her back constantly hurts. (Id.) In addition, she can only stand for 5-10 minutes at a time, her lower back and left leg cause her extreme pain, and she cannot sleep because of her lower back and left leg pain, and her restless leg syndrome. (Id.) She takes a pill for the restless leg syndrome, but it takes an hour or two to take effect. (Id.) In the meantime, she constantly has the urge to urinate. (Tr. 54-55.) She is unable to see doctors because Jess withholds money from her, and Jess told the pharmacy in Monroe City not to allow her to charge any medication. (Tr. 55.)

Aguon said that she is going to leave this situation, but cannot use the resources from the women's shelter while she is living with her husband because he is so controlling that he makes her beg for food. (Tr. 55-56.) Aguon drove herself to the hearing, although she had to

search for five dollars in quarters to pay for gas because Jess does not let her have gas money.  (Tr. 56.)

She was treated at Mercy Medical Center a year before the hearing after she attempted suicide.  (<u>Id.</u>)  She is being treated for depression and has suffered from it for as long as she can remember. (<u>Id.</u>)  She was hospitalized for depression three times, most recently in July. (Tr. 57.)

After epidural steroid injections did not provide long term relief from her April 19, 2004 injury, Dr. Jameson recommended that have back surgery and a neurosurgical evaluation.  (<u>Id.</u>)  That injury still causes her problems with her neck, arms, and middle back between her shoulder blades. (<u>Id.</u>)  Specifically, she gets muscle spasms in her neck, which limits her range of motion and causes her migraines, and muscle spasms in her right shoulder blade, which limits her range of motion and use of her right arm due to numbness and a tingling sensation.  (Tr. 58.)  She can only sleep for about two hours at a time because of her restless leg syndrome and pain in her lower back and leg, although she sleeps better during the day.  (Tr. 59.)  The pain feels like "somebody's in there with boxing gloves beating inside [her] legs." (<u>Id.</u>)

Although she can only stand for 5-10 minutes before the pain in her left leg and lower back becomes severe, she can sit for at least 4-5 hours at a time, depending on whether her restless leg syndrome irritates her. (Tr. 59-60.)  She can walk up to a block before her lower back and leg hurt. (Tr. 60.)  She has trouble stooping, turning her head, and rotating her neck. (Tr. 60-61.)  She cannot climb more than 15 stairs. (Tr. 61.) The apartment where she lives has only three stairs.  (<u>Id.</u>) Bending over relieves pressure on her back, but she cannot stay in that position for long. (<u>Id.</u>)  She can lift about ten pounds at a time, but if she lifts more than that, she has trouble sleeping that night and has pain the next day.  (Tr. 62.)  She and Jess buy half-gallon containers of milk so that it is easier for her to get it out of the refrigerator. (<u>Id.</u>)  She has little gripping strength, and reaching overhead causes muscle spasms in her right shoulder blade. (<u>Id.</u>)

Aguon also has trouble concentrating. (<u>Id.</u>)  Sometimes she will be driving and suddenly look up and not remember how she got there.  (Tr. 63.)  She does not watch much television because she does not have

patience for it.  (Id.)  She has trouble being in close proximity to people and cannot stand noises like popping gum or tapping on tables. (Id.)  She also has difficulty remembering things.  (Id.)  She attempted suicide because her family is depressed, and at the time, she "couldn't see the light at the end of the tunnel."  (Tr. 63-64.)  She still frequently contemplates suicide.  (Tr. 64.)

Although Dr. Cohen wanted her to take Lexapro, she is not taking it because it knocked her out all day long. (Id.)  Her doctor prescribed Zoloft and raised her Paxil dosage, but Paxil has been the only medicine that has "agree[d] with [her]" thus far.  (Id.)  She returned to the doctor's office to tell the doctor that she could not take Zoloft or Lexapro, but she left after waiting for 20-30 minutes in the waiting room without anyone coming to get her because her mental state was "getting pretty bad" and a girl was sitting in the waiting room popping her gum. (Tr. 65.)

### Testimony of the Vocational Expert

Darrell Taylor, a vocational expert (VE), testified that Aguon's past work included: (1) casino dealer, a light and semiskilled position; (2) LPN, a medium and skilled position; and (3) photographer, a light and semiskilled position according to the DOT, but could be medium if she carried heavy equipment as stated in her testimony. (Tr. 66-67.)  None of her past work skills are transferable to lighter than light.  (Tr. 67.)  However, she could be an office nurse who takes vital signs and brings patients back to examination rooms, which is light work. (Id.)

The ALJ then posed a number of hypothetical questions to the VE. In the first hypothetical, the ALJ asked the VE to assume an individual of Aguon's age, education, and work experience, who could lift 20 pounds on occasion, 10 pounds frequently, and could stand and/or walk about 6 hours in an 8-hour workday and could sit less than 6 hours in an 8-hour workday.  (Tr. 67-68.)  That person would also have to avoid climbing ladders, ropes, and scaffolds, and would be limited to simple and/or routine tasks.  (Tr. 68.)  The VE testified that this hypothetical individual would not be able to perform any of Aguon's past work.  (Id.) However, that individual could perform unskilled work in a janitorial

cleaning position or a hand packer position, which are light and unskilled positions. (Id.)

In the second hypothetical, the ALJ reduced the exertional limitation to sedentary work, which would mean the individual had the same restrictions as in the first hypothetical, except this individual could lift only 10 pounds, sit and/or walk for about 2 hours, and sit for at least 6 hours. (Id.) The VE testified that this individual could still perform unskilled, sedentary work, including work as an assembler or a production inspector/checker. (Id.)

In the third hypothetical, the individual needed to occasionally get up and move around, but would not have to leave the work area. (Tr. 69.) The VE testified that this individual could still perform the jobs outlined, so long as he or she remained at the workstation. (Id.)

In the fourth hypothetical, the individual would consistently miss more than two days a month due to medical reasons. (Id.) The VE testified that this restriction would preclude competitive employment after a brief period of time. (Id.)

In the fifth hypothetical, the individual could show up every day but for some medical reason would randomly show up late, leave early, or be away from the work setting for at least the equivalent of an additional break time every week. (Id.) The VE testified that those limitations would preclude competitive employment. (Id.)

Aguon's representative then asked the VE to assume a sixth hypothetical, in which the individual would be moderately restricted for a third of the time in his or her ability to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; (5) to get along with coworkers or peers; and to adjust to change in the work setting. (Tr. 70.) The VE testified that these limitations would preclude employment. (Id.)

### III. DECISION OF THE ALJ

On February 27, 2008, the ALJ issued an unfavorable decision. (Tr. 5-21.)  The ALJ found that Aguon meets the insured status requirements of the Social Security Act through September 30, 2009. (Tr. 10.)  The ALJ also found that she has not engaged in substantial gainful activity since April 19, 2004, the alleged onset date. (Id.)

The ALJ found that Aguon has the following severe combination of impairments: degenerative disc disease of the cervical and lumbar spine, pathological gambling, major depressive disorder, and generalized anxiety disorder. (Id.)  The ALJ noted four other possible impairments that did not ultimately meet the requirements for inclusion: chest pain, effects from the sexual assault, restless leg syndrome, and headaches. (Tr. 10-11.)  The ALJ explained that although Aguon was treated for two days in 2007 for chest pain, there was no indication in the record that there would be any significant work-related limitations associated with it. (Tr. 10.)  Further, Aguon did not assert that there were any long-term work-related limitations resulting from the sexual assault that she was treated for in 2007. (Id.)  Although Aguon had been treated for restless leg syndrome with medication, there was no indication in the record that she suffered any work-related limitations due to the condition. (Tr. 10-11.)  Although Aguon had occasionally sought treatment for headaches, the headaches do not occur with sufficient frequency, duration, or severity to preclude her from engaging in sustained work activity. (Tr. 11.)

The ALJ then found that Aguon does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.) In doing so, the ALJ found that Aguon has only mild restrictions on activities of daily living; mild difficulties with social functioning; moderate difficulties with concentration, persistence, and pace; and no episodes of decompensation.  (Id.)  Thus, the ALJ held that Aguon does not have an impairment or combination of impairments that meets or medically equals a listed impairment.  (Id.)

After considering Aguon's symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence, the ALJ found that Aguon has the residual functional capacity

(RFC) to perform the exertional and nonexertional requirements of work with the following limitations: (1) she can lift and carry 20 pounds occasionally and ten pounds frequently; (2) she can stand and or walk 6 hours in an 8-hour workday and sit less than 6 hours in an 8-hour workday; (3) she cannot climb ladders, ropes, or scaffolds; and (4) she can only perform simple and/or repetitive tasks. (Id.)

After reviewing Aguon's testimony, the ALJ concluded that Aguon's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that her statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (Tr. 14.)

The ALJ found that Dr. Alkurdy's January 26, 2006 Social Security Disability assessment showed few, if any, abnormalities, and that Aguon had not sought treatment for any of her complaints for almost a year prior. (Tr. 15-16.) Dr. Alkurdy also found that Aguon could alternate sitting, standing, and moving around in an 8-hour work day; would have no significant problems handling objects; some restrictions lifting weights greater than 25 pounds if it was proven that she has back or neck pathology; and there were no specific work environmental hazards that Aguon needed to avoid. (Tr. 16.) The ALJ then found that Dr. Griffith's findings — that Aguon could occasionally lift 20 pounds; frequently lift 10 pounds; sit less than 6 hours in an 8-hour workday; stand and/or walk about 6 hours in an 8-hour workday; no push or pull limitations with either her upper or lower extremities; and could not climb ladders, ropes, or scaffolds — were supported by Dr. Alkurdy's examination and Aguon's lack of treatment since December, 2004. (Id.)

The ALJ also found that no treating or examining physician has stated or implied that Aguon is totally incapacitated on a long term basis, and that no physician has imposed specific physical work-related limitations that were more restrictive than the limitations of the RFC. (Id.) The ALJ also noted that there was no evidence to support a finding that Aguon has ever been refused medical treatment because of her inability to pay. (Id.) The ALJ then noted Aguon's lack of treatment since December, 2004; successful physical therapy and epidural steroid injections; lack of surgery; low strength pain medication; lack of

- 23 -

consistent clinical findings of chronic pain upon physical examination; and lack of objective evidence of muscle atrophy, bowel or bladder dysfunction, or severe and persistent muscle spasms, neurological deficits, or inflammatory signs. (Tr. 16-17.)

The ALJ then noted that Aguon's physical appearance did not add to the weight of her allegations of disability. (Tr. 17.) The ALJ did not observe credible signs of significant motor deficits or serious discomfort during the hearing. (Id.) The ALJ found that Aguon's testimony regarding limitations on her daily activities were "largely a matter of choice," given that no physician has imposed such limitations on her. (Id.) The ALJ also found that because Aguon is able to watch television, read, visit the casino, play slot machines, and do other activities requiring concentration, that there was not substantial evidence to support Aguon's allegations of severe nonexertional pain which would significantly diminish her ability to concentrate. (Id.)

Regarding Aguon's mental impairments, the ALJ reviewed the medical record and found that the evidence indicated that she was able to perform household tasks, including washing dishes, sweeping, mopping, vacuuming, making beds, and was able to drive, shop, read, and play computer solitaire. (Tr. 19.) The ALJ also found that Aguon's abilities to think, understand, remember, communicate, concentrate, get along with others, and handle normal stress were not impaired such that she would be unable to perform unskilled work. (Id.) The ALJ noted that there was no evidence of serious deterioration due to mental impairments of Aguon's personal hygiene habits, daily activities, interests, effective intelligence, reality contact, thought processes, memory, speech, attention span, insight, judgment, behavior patterns, posture, gait, mannerisms, or motor activity. (Id.) The ALJ also noted that Aguon's concentration has generally been found to be good, and that no psychologist or physician other than Dr. Martin diagnosed Aguon with somatization disorder. (Id.) The ALJ concluded that Aguon does not have any physical limitations due to mental impairments and has only mild or moderate mental limitations, given the effectiveness of her medication, her lack of psychiatric treatment, and her conduct during the hearing. (Id.)

The ALJ also found that although Aguon's work record neither added nor detracted from her credibility, Aguon's testimony was not fully credible and her allegations of total disability were not supported by the weight of the evidence. (Id.)

The ALJ concluded that Aguon is not able to perform her past relevant work, but considering her age, education, work experience, and functional abilities, there are jobs that exist in significant numbers in the national economy that she can perform. (Tr. 19-20.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from

- 25 -

a severe impairment, and (3) her disability meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. <u>Id.</u> Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. <u>Id.</u> The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. <u>Id.</u> If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. <u>Id.</u>

In this case, the Commissioner determined that Aguon could not perform her past work, but that she maintained the RFC to perform other work in the national economy.

## V. DISCUSSION

Aguon argues that the ALJ erred in (1) failing to properly evaluate her mental impairment and resulting functional limitations; (2) evaluating her subjective complaints; and (3) failing to adopt the testimony of the VE. Aguon also argues that the ALJ has a bias against Social Security claimants with similar characteristics alleged by her. (Doc. 13.)

## A. Mental Impairments

Aguon argues that the ALJ's findings regarding her degree of functional loss resulting from her mental impairments ignore and contradict the medical evidence.

### 1. Sufficiency of the ALJ's Discussion

Under the regulations, the ALJ must evaluate the degree of functional loss caused by mental impairments by gauging their impact on four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). In making these findings, the ALJ's decision "must show the significant history, including examination and laboratory findings, and the

functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 404.1520a(e)(4). The ALJ's decision also must "include a specific finding as to the degree of limitation in each of the functional areas described in [20 C.F.R. § 1520a(c)(3)]." Id. Failure of the ALJ to include analysis of the psychiatric review technique in the decision may warrant remand. See Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007).

To the extent Aguon argues that the ALJ failed to rate the degree of functional loss resulting from the mental impairment, this argument is refuted by the ALJ's opinion, in which the ALJ expressly applied the five-point scale to the first three functional aries, and the four-point scale to the final functional area. 20 C.F.R. § 404.1520a(c)(4). Specifically, the ALJ found that Aguon has mild restrictions on her daily activities; mild difficulties with social functioning; moderate difficulties with her concentration, persistence, or pace; and no episodes of decompensation. (Tr. 11.)

To the extent Aguon argues that the ALJ failed to make specific evidentiary references in support of his findings, this argument is also refuted by the record. The ALJ examined the medical evidence of Aguon's mental impairments, and discussed Dr. Martin's findings from his January 3, 2006 examination, including Aguon's prior mental health and treatment history, as well as Dr. Alkurdy's notes, Aguon's reported history to Dr. Anderson, the psychiatric evaluation performed by Dr. Cohen, Aguon's stay at Fort Madison Community Hospital after attempting suicide, and Aguon's receipt of therapy at Mark Twain Area Counseling Center. (Tr. 17-19.)

The ALJ concluded that Aguon's daily activities were only mildly restricted because she able to perform house hold tasks, including doing dishes, sweeping, mopping, vacuuming, making beds, cooking cleaning, laundry, taking out the garbage, driving, and shopping. (Tr. 19.) The ALJ also noted that Aguon is able to read and play computer solitaire. (Id.)

The ALJ reasoned that Aguon had only mild difficulties with social functioning based on Dr. Martin's opinion that Aguon's "judgment abilities, particularly with social situations were intact for most vocational situations, although she did have a history of substance abuse

and gambling addiction, which might create social problems." (Id.) The ALJ added that Aguon's ability to communicate and get along with other people were not so impaired that she would be unable to perform unskilled work. (Id.)

The ALJ reasoned that Aguon had only moderate difficulties with concentration, persistence, or pace because her ability to "think, understand, remember, concentrate, . . . and handle normal stress" did not preclude her from performing unskilled work. (Id.) The ALJ also noted that Aguon's "concentration has generally been found to be good," and no other physician confirmed Dr. Martin's diagnosis of a somatization disorder. (Id.)

Therefore, the ALJ's findings regarding Aguon's functional limitations from her mental impairments were not so deficient as to warrant remand. See Jumping Eagle v. Barnhart, No. Civ. 05-5016-RHB, 2006 WL 858972, at *4 (D.S.D. Mar. 27, 2006). See also Strickland v. Astrue, No. 4:07 CV 1228 BD, 2009 WL 385865, at *2-3 (E.D. Ark. Feb. 12, 2009); Peterson v. Astrue, No. 07-4068 ADM/RLE, 2008 WL 4323717, at *26 (D. Minn. Sept. 18, 2008).


### 2. Consideration of Medical Evidence

Aguon also argues that the ALJ did not consider certain evidence in making his findings. Specifically, Aguon points to the treatment notes of Dr. Cohen, Ms. Paddock's notes, her most recent suicide attempt, and her abusive relationship with her husband. Aguon argues that based on this evidence, she has, at a minimum, marked limitations in her daily activities, social functioning, and ability to maintain concentration, persistence, and pace.


### Dr. Cohen and Ms. Paddock

The ALJ found that Aguon's severe combination of impairments included pathological gambling, major depressive disorder, and generalized anxiety disorder. (Tr. 10.) The ALJ found that Aguon's reported mental impairments caused only mild restrictions of her daily activities and social functioning, moderate difficulties with her concentration, persistence, or pace, and no episodes of decompensation.

(Id.)  The ALJ then found that Aguon's combination of mental impairments would limit her to performing simple or repetitive tasks.  (Id.)

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians."  Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).  In doing so, the ALJ must explain the reasons for the determination.  Coleman v. Astrue, 498 F.3d 767, 773 (8th Cir. 2007); Cruz v. Comm'r of Soc. Sec., 244 Fed. App'x 475, 479 (3d Cir. 2007).  "While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand."  Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005).

The ALJ recognized that on two occasions, Dr. Cohen found that Aguon was severely depressed, that her affect was blunted, and that she had paranoia.  (Tr. 18, 402-04, 406.)  The ALJ also recognized that Dr. Cohen diagnosed recurrent major depression with psychotic symptoms, pathological gambling, a history of methamphetamine and cocaine dependence, and a history of alcohol abuse, and that Dr. Cohen assigned a GAF score of 50.  (Id.)  The ALJ also noted that Dr. Cohen's February 28, 2007 report stated that Aguon had no energy, was losing weight, had a blunted affect, had sold her house, hated being with people, and had gotten a job at a gambling boat but lasted only one week.  (Tr. 18, 406.)

However, the ALJ did not discuss the weight he assigned to Dr. Cohen's opinion, or otherwise incorporate Dr. Cohen's opinion in his determination.  (Tr. 19.)  As a treating physician,[15] Dr. Cohen's opinion would generally be given greater weight than that of a non-treating physician.  Dewald v. Astrue, 590 F. Supp. 2d 1184, 1200 (D.S.D. 2008); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The ALJ must provide "good

_____

[15]"Treating physicians are defined broadly by the regulations as any physician who has provided the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant."  Dewald v. Astrue, 590 F. Supp. 2d 1184, 1200 (D.S.D. 2008).  Although the record states that Dr. Cohen only saw Aguon twice, a physician "need not provide treatment at all times to be considered a treating physician."  Id.  Even if Dr. Cohen was only an examining physician, his opinions "were entitled to more weight than nonexamining sources."  Id. at 1201; 20 C.F.R. §§ 404.1527(d)(1); 416.927(d)(1).

reason" for not crediting the opinion of a treating physician. 20 C.F.R. §§ 404.1527(d)(2). Failure to do so is a ground for remand. <u>Snell v. Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999).

That the ALJ did not discuss Dr. Cohen's status as a treating physician or analyze the weight given to his opinion constitutes reversible error, because there is "no way to definitively assess whether the [physician's] opinion[] [was] properly discounted." <u>Dewald</u>, 590 F. Supp. 2d at 1202. <u>See also id.</u> at 1201-03 (remanding because ALJ did not specify whether physician was a treating physician and did not discuss weight given to physician's opinion).

Similarly, although the ALJ recognized the existence of Ms. Paddock's notes, the ALJ did not fully recognize that the notes stated that Aguon had pain issues, depression, was not working, was living at a shelter, had a "range of affect," and appeared to have difficulty concentrating (Tr. 480), or provide an analysis of Ms. Paddock's notes in making his determination.[16]

Therefore, the case must be remanded to the ALJ to resolve the conflict between Dr. Cohen's opinion, Dr. Martin's opinion, and Ms. Paddock's notes, and to provide a complete analysis of the weight given thereto. <u>See, e.g.</u>, <u>Love v. Astrue</u>, 2008 WL 877762, at *4-5 (E.D. Ark. Mar. 26, 2008) (remanding because the ALJ's decision was deficient in failing to explain her reasons for disagreeing with medical evidence); <u>Strom v. Astrue</u>, Civil No. 07-150 (DWF/RLE), 2008 WL 583690, at *27 (D. Minn. Mar. 3, 2008) (remanding because ALJ did not explain how he resolved the conflict in the medical opinion evidence); <u>Anderson v. Barnhart</u>, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) (remanding because ALJ did not discuss or give good reason for the weight given to treating physician's opinion).

---

[16]Ms. Paddock's notes and opinion must be accorded some measure of consideration, regardless of her status. <u>Cf.</u> <u>Willcockson v. Astrue</u>, 540 F.3d 878, 880-81 (8th Cir. 2008) ("statements of lay persons regarding a claimant's condition must be considered when an ALJ evaluates a claimant's subjective complaints of pain.").

### Suicide Attempt

Regarding Aguon's most recent suicide attempt, the ALJ stated, "Although [Aguon] had one suicide attempt during the period relevant to this decision, it appears to be related to an argument with her brother-in-law about her housing arrangements, and the suicidal ideations soon passed." (Tr. 19).

The ALJ noted Aguon's June 21, 2007 treatment after she attempted suicide after she fought with her brother-in-law and began to think that people did not want her around anymore. (Id.) According to the treatment notes, although Aguon had suicidal thoughts before the drug overdose, she did not want to kill herself, and the nurses noted that Aguon was visible, social, pleasant, oriented, her thoughts were focused, and her affect was neutral. (Tr. 425, 444-45.) Before Aguon was discharged, she stated that she no longer had thoughts of self harm. (Tr. 445.)

In sum, the ALJ adequately discussed his analysis in this regard, and substantial evidence supports his conclusion.

### Abusive Relationship

Although Aguon argues that the ALJ erred in failing to consider her sexual assault and abusive relationship, Aguon has not shown how either has impacted her mental impairments.

Therefore, the ALJ did not err in not including discussion of Aguon's sexual assault or abusive relationship.

### Duty to Contact Dr. Cohen

Aguon argues that the medical evidence triggered the ALJ's duty to develop the record to determine if Dr. Cohen's opinion deserved controlling weight.

Although "the ALJ has a duty to fully develop the record," Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006), Aguon does not identify a specific reason why the ALJ would need to contact Dr. Cohen for additional information. There is no indication that Dr. Cohen's notes are incomplete, ambiguous, or inherently contradictory. Cf. 20 C.F.R. 404.1512(e)(1) (ALJ must contact treating physician for clarification if

the treating physician's report "contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques").

Therefore, the ALJ may, but need not necessarily contact Dr. Cohen for additional information on remand.

## B. Aguon's Credibility

Aguon argues that although the ALJ discussed the correct factors to be weighed in evaluating her credibility, the ALJ did not apply these factors to the evidence and thus improper determined her credibility.

When weighing a claimant's testimony, the ALJ must take into account the Polaski factors, which include: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) any functional restrictions. Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). However, the ALJ's decision need not discuss the relation of every Polaski factor to the claimant's credibility. Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004).

The credibility of a claimant's subjective testimony is primarily a decision for the ALJ, not the courts. Pearsall, 274 F.3d at 1218. While an ALJ may not disregard subjective complaints solely because they are not fully supported by medical evidence, the ALJ may discount such complaints if they are inconsistent with objective medical findings. Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010); Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002). Deference is given to the ALJ's credibility determinations so long as they are supported by good reasons and substantial evidence. Jones, 619 F.3d at 975.

Aguon argues that the ALJ erred in his credibility analysis because the evidence regarding her physical and mental impairments supported her testimony. For the reasons discussed below, the court disagrees.

## 1. Physical Impairments

Regarding Aguon's credibility of her physical impairments, the ALJ held that her "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 14.)  The ALJ then summarized medical evidence that was inconsistent with Aguon's testimony.  An ALJ may discount a claimant's complaints if there are inconsistencies in the record as a whole.  Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

Substantial evidence supports the ALJ's determination.  As the ALJ noted, Aguon's lower back pain improved after seeing Dr. Fritz (Tr. 331), "markedly improved" by the time she saw Dr. Mooney (Tr. 316), and continually improved during her physical therapy sessions.  (Tr. 281-97.)  At her last physical therapy session, she said she was 75 percent better with the therapy and epidural steroid injections.  (Tr. 295.)  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009).

The ALJ also properly weighed the fact that Aguon missed two scheduled appointments with Dr. Fritz (Tr. 330) against her credibility.  Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004).  See also Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008).

The ALJ correctly noted that although Dr. Mooney's examination revealed that Aguon had spasms, a reduced range of motion in her cervical spine, tenderness in her levator, and tightness in her muscles, she had a normal range of motion in her shoulders, no sensory loss, and normal grip strength and wrist motion.  (Tr. 268.)  Dr. Mooney also noted no tenderness in Aguon's lumbar or thoracic spine, and only mild degenerative changes of her cervical spine.  (Id.)  Similarly, Dr. Jameson noted no weakness of Aguon's upper or lower extremities.  (Tr. 316.)  Dr. Alkurdy noted that Aguon had normal strength; deep tendon reflexes in both her upper and lower extremities; no abnormal movements; normal sensory testing; a normal gait; normal grip strength bilaterally; normal range of motion; and an unremarkable neurological examination.  (Tr. 322-23.)  These inconsistencies support the ALJ's credibility

determination.  <u>Howe v. Astrue</u>, 499 F.3d 835, 841 (8th Cir. 2007) (affirming the ALJ's credibility finding "[b]ecause the ALJ described the inconsistences on which he relied in discrediting [the claimant's] complaints and because those inconsistencies were supported by the record"); <u>Manning v. Astrue</u>, No. 4:07 CV 1244 FRB, 2008 WL 2906862, at *14 (E.D. Mo. July 24, 2008).

The ALJ also noted that Aguon "does not take particularly strong doses of pain medication." (Tr. 16.)  Dr. Alkurdy's notes state that Aguon mainly took over-the-counter medications for her pain.  (Tr. 321.) "A claimant's allegations of disabling pain may be discredited by evidence that he or she has received minimal medical treatment and/or has taken medications, other than aspirin, for pain only on an occasional basis." <u>Williams v. Bowen</u>, 790 F.2d 713, 715 (8th Cir. 1986).  <u>See also</u> <u>Wilson v. Chater</u>, 76 F.3d 238, 241 (8th Cir. 1996); <u>Barrett v. Astrue</u>, 2008 WL 2783265, at *4 (W.D. Ark. July 15, 2008).

The ALJ also noted that there were "few instances" in which Aguon complained of lumbar and cervical pain after December, 2004.  (Tr. 15.) According to the record, after receiving treatment for leg pain on December 25, 2004 (Tr. 275-80), Aguon only sought treatment for her alleged physical impairments from Dr. Anderson on April 27, 2006 (Tr. 333) and November 1, 2006 (Tr. 405), and from Mercy Medical Center while admitted for psychiatric treatment from June 21, 2007 to June 24, 2007 (Tr. 422, 425, 431, 437, 444-46, 449).[17]  An ALJ may discredit a claimant's credibility because of his failure to seek medical treatment. <u>Torres v. Astrue</u>, 372 Fed. App'x 683, 693 (8th Cir. 2010) (per curiam).

Aguon testified that she had not sought medical treatment because she could not afford it and she and her husband were uninsured.  (Tr. 38, 49.)  Although an inability to pay may justify a claimant's failure to seek medical care, <u>Vasey v. Astrue</u>, No. 1:08 CV 46 SWW/JTR, 2009 WL 4730688, at *5 (E.D. Ark. Dec. 3, 2009); <u>Skovlund v. Astrue</u>, No. CIV 08-4078, 2009 WL 3055421, at *24 (D.S.D. Sept. 24, 2009), a claimant must

---

[17]Aguon also received treatment from the Hannibal Regional Hospital for chest pain on August 27, 2007.  (Tr. 481-505.)  The ALJ also noted that Dr. Alkurdy's January 26, 2006 examination was for Social Security Disability assessment purposes only.  (Tr. 15,

present "supporting evidence" that her failure to seek medical treatment was due to the expense. George v. Astrue, 301 Fed. App'x 581, 582 (8th Cir. 2008) (per curiam). See also Carrigan v. Astrue, No. 4:08 CV 4018, 2009 WL 734116, at *6-7 (W.D. Ark. Mar. 17, 2009) (claimant's "bare statement" that she is unable to afford medical treatment is insufficient to establish that inability). Because Aguon did not "identify any steps [she] took to obtain low cost medical care," and because "[she] did not testify that [she] was denied medical care because of [her] financial condition," the ALJ properly discounted her credibility because of her irregular medical treatment since December 25, 2004.[18] Weaks v. Shalala, 1993 WL 498046, at *1, 12 F.3d 1104 (8th Cir. 1993) (unpublished table opinion); see also Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003); Carrigan, 2009 WL 734116, at *7.

The ALJ found that no doctor has declared Aguon totally incapacitated on a long term basis. That an examining physician did not "submit[] a medical conclusion that [the claimant] is disabled and unable to perform any type of work" is a significant factor for the ALJ to consider. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2009).

Similarly, the ALJ noted that no physician had imposed any specific physical work-related limitations more restrictive than those he found, and that Dr. Alkurdy's and Dr. Griffith's restrictions were less than those imposed by him. Compare (Tr. 11) with (Tr. 323) and (Tr. 354-61.)

_____

[18]Aguon testified that she applied for Iowa Care and wanted to apply for Medicaid, but that social services told her that she had to be on disability before she could apply for Medicaid. (Tr. 38-39.) Ultimately, however, Aguon "has not provided adequate proof demonstrating that she has attempted to obtain financial assistance." Trevino v. Astrue, No. 1:08-cv-820-WGH-RLY, 2009 WL 405862, at *9 (S.D. Ind. Feb. 18, 2009) (rejecting the claimant's argument that the ALJ should have considered her inability to pay for medical treatment because "she was told by her sisters that she was not eligible for Medicaid").

In addition, the record states that Aguon had smoked a pack of cigarettes each day for 40 years. (Tr. 315, 322, 495.) This undermines her claim that she could not afford medical treatment. Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999); Turner v. Astrue, No. 4:08 CV 107 CAS, 2009 WL 512785, at *12 (E.D. Mo. Feb. 27, 2009) ("In addition, although Plaintiff claims that he could not afford his medication, the ALJ properly relied upon the fact that Plaintiff did not forgo smoking to help finance his medication.").

This further supports the ALJ's credibility determination.  See McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).

The ALJ also reasoned that he did not observe credible signs of significant motor deficits or serious discomfort during the hearing. Aguon argues that the ALJ erred by considering this in making his credibility determination.  However, "[t]he ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations."  Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001).  Because the ALJ did not rely solely on Aguon's demeanor during the hearing in discounting her credibility, the ALJ did not err.  See Schultz v. Comm'r of Soc. Sec., No. 08-550 (RHK/JJK), 2009 WL 81018, at *13 (D. Minn. Jan. 9, 2009).

Although Aguon testified to limitations of her daily activities, the ALJ found that the limitations are self-imposed.  See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2003); Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).  Further, Aguon's testimony regarding her limitations is contradicted by her daily activities that she reported performing to her physicians.  Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008).

Given the inconsistencies in the record, the ALJ did not err in discounting Aguon's credibility regarding her physical impairments.

### 2. Mental Impairments

Aguon argues that the ALJ improperly discounted her credibility regarding her functional limitations from her mental impairments. Specifically, Aguon argues that the ALJ improperly discounted her credibility based on her demeanor during the hearing, and that substantial evidence does not otherwise support the ALJ's decision.

In discounting Aguon's credibility regarding the functional limitations stemming from her mental impairments, the ALJ stated, "Although [Aguon] cried during part of the hearing, she did no display any signs of significant mental dysfunction during the course of the hearing." (Tr. 19.)  As with Aguon's credibility regarding her physical impairments, the ALJ did not improperly consider Aguon's demeanor during the hearing in assessing her credibility regarding her mental impairments.  The ALJ provided other legitimate reasons for discrediting

Aguon's credibility, including Dr. Martin's findings, Aguon's lack of consistent medical treatment, and the effectiveness of Aguon's medication.

Therefore, the ALJ did not err in considering Aguon's demeanor as a factor in discounting her credibility regarding the functional limits of her mental impairments, and substantial evidence supports the ALJ's credibility determination.

## C.  VE Testimony

Aguon argues that the ALJ erred in failing to adopt the VE's testimony given in response to hypotheticals four, five, and six.

Because remand is appropriate for further consideration and analysis of Dr. Cohen's treating opinion and Ms. Paddock's therapy notes, Aguon's argument is moot.

## D.  ALJ Bias

Aguon argues that the ALJ was predisposed to denying her claim, particularly because she alleged a mental impairment.  She notes that, in 2006, the ALJ's disability claim approval rate was 36%, and that the national average rate of grading disability claims of 62% that year. Aguon also notes that of the 43 claimants represented by her counsel's law firm who appeared before this ALJ and alleged mental impairments, 36 were either denied or found not to have a disabling mental impairment, and 7 were found to have disabling mental impairments, yielding a 83.7% denial rate.

A Social Security disability claimant has the right to a full and fair hearing before an impartial ALJ.  Valenti v. Comm'r of Soc. Sec., 373 Fed. App'x 255, 258 (3d Cir. 2010); Meyler v. Comm'r of Soc. Sec., 238 Fed. App'x 884, 889 (3d Cir. 2007).  ALJs are presumed to be unbiased, although this presumption can be rebutted by a showing of a "conflict of interest or some other specific reason for disqualification." Valentine v. Comm'r of Soc. Sec., 574 F.3d 685, 690 (8th Cir. 2009); Rollins v. Massanari, 261 F.3d 853, 857-58 (9th Cir. 2001).  The claimant bears the burden of showing that the ALJ's behavior,

in the context of the whole case, "was so extreme as to display [a] clear inability to render a fair judgment." Rollins, 261 F.3d at 858.

The statistics provided by Aguon, standing alone, cannot support a finding of bias. See Perkins v. Astrue, 2:09 CV 38 AGF, 2010 WL 3908598, at *15-16 (E.D. Mo. Sept. 30, 2010); Doan v. Astrue, No. 04 CV 2039 DMS (RBB), 2010 WL 1031591, at *14-15 (S.D. Cal. Mar. 19, 2010). To prove an ALJ's general bias, a claimant should be able to show both direct and circumstantial evidence of bias. Doan, 2010 WL 1031591, at *14. Relevant evidence considered in determination whether bias is present includes "(1) admissions by the ALJ indicating generalized bias or predisposition against Social Security claimants generally or certain groups specifically; (2) testimony from attorneys regarding the ALJ's regular use of incorrect law; (3) statistical evidence showing the number of cases involving problematic credibility determinations; and (4) statistical evidence showing the number of times claimants received benefits after remand or on subsequent applications." Perkins, 2010 WL 3908598, at *15. See also Doan, 2010 WL 1031591, at *14-*15.

In this case, the ALJ provided Aguon with a hearing that lasted over an hour an a half. (Tr. 29-73). None of the ALJ's comments or questions during the hearing can be seen as showing bias or disrespect, nor does the ALJ's opinion display a bias against Aguon's claims. Aguon has not provided any evidence that the ALJ has previously made derogatory statements about Social Security claimants, nor has she argued that the ALJ regularly uses incorrect legal standards. Aguon has also not provided statistics "showing how many of the ALJ's decisions have been reversed and/or remanded by the Appeals Council or a court, or how many times claimants have subsequently received benefits." Perkins, 2010 WL 3908598, at *16. In sum, Aguon has not established that the ALJ showed a particular bias against her in this case. See Johnson v. Comm'r of Soc. Sec., Civil Action No. 09-4901 WJM, 2009 WL 4666933, at *4 (D.N.J. Dec. 3, 2009) ("Alleged examples of bias displayed by [the ALJ] in prior cases involving different plaintiffs are not relevant."); Smith v. Astrue, Civil Action No. H-07-2229, 2008 WL 4200694, at *5 (S.D. Tex. Sept. 9, 2009) ("[D]istrict courts are in no position to judge what threshold percentage of 'favorable' decisions is necessary to acquit an

ALJ of suspicion of intolerable bias against Social Security claimants.").

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g) for further evaluation.  On remand, the ALJ shall reconsider the functional limitations of Madeline Aguon resulting from her mental impairments in light of (1) the treatment by and the findings and opinions of treating physician Katherine Cohen, D.O.; and (2) the counseling therapy provided by and expert opinions and findings rendered by Jana Paddock.  The ALJ shall specifically describe his consideration of this material.  An appropriate Judgment Order is issued herewith.


      /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on March 7, 2011.